UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

**FLORIDA GAS TRANSMISSION COMPANY, LLC,**

    Plaintiff,

v.                                                      2:23-cv-612-SPC-NPM

**+/- 1.211 ACRES OF LAND IN CHARLOTTE COUNTY, FLORIDA, SOUTH WEST FLORIDA HORSE RESCUE, INC., COMMUNICATIONS TOWER GROUP LLC,** and **UNKNOWN OWNERS, IF ANY,**

    Defendants.

---

**ORDER[1] GRANTING PARTIAL SUMMARY JUDGMENT ESTABLISHING PLAINTIFF'S RIGHT TO CONDEMN EASEMENTS AND GRANTING PRELIMINARY INJUNCTION FOR IMMEDIATE POSSESSION**

Before the court is plaintiff Florida Gas Transmission Company, LLC's motion for partial summary judgment establishing its right to condemn easement (Doc. 9) and FGT's motion for preliminary injunction for immediate possession. (Doc. 8). Informed by a stipulated order offered jointly by the parties, the motions are **granted**.

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to the referral and disposition by the undersigned of the motions for partial summary judgment and for preliminary injunction. (Docs. 50, 53).

1

## I. Background

With the permission of the Federal Energy Regulatory Commission ("FERC"), FGT is constructing and operating a project that involves the abandonment and relocation of certain portions of pipeline (the "Relocation Project") located in Charlotte and Lee Counties (the "Counties"). FGT filed this condemnation action against defendants +/- 1.211 Acres of Land in Charlotte County, Florida, South West Florida Horse Rescue, Inc., Communications Tower Group LLC, Lee County Electric Cooperative, Inc., and unknown owners (if any) in order to acquire the subject easements necessary to complete the Relocation Project. The defendants were properly notified and served in accordance with Federal Rule of Civil Procedure 71.1. (Docs. 7, 20, 24, 31-32).

On November 10, 2023, the parties filed a stipulation of dismissal of LCEC. (Doc. 48). And Clerk's default was entered against Communications Towers Group LLC on September 25, 2023. (Docs. 33, 41). Clerk's default was also entered against any unknown owners on November 14, 2023, since no other party appeared. (Docs. 45, 49). The remaining defendant and property owner—South West Florida Horse Rescue, Inc. ("SWFHR"), through counsel, appeared and does not object to the entry of the order granting FGT's motions for partial summary judgment and preliminary injunction for possession.

## II. Findings of Fact

### A. Purpose of the Relocation Project

The Relocation Project was initiated because of the planned road improvement project for State Road 31 by the Florida Department of Transportation ("FDOT") and the planned expansion of property development by Babcock Property Holdings, LLC ("Babcock Property"). (Doc. 11-1 ¶ 5; Doc. 13-1 ¶ 7; Doc. 14-1 ¶ 18). As a result of existing and ongoing development, traffic has increased along SR 31. Consequently, the need for additional roadway capacity and safety enhancements has become a priority. (Doc. 14-1 ¶ 6).

The location of the Relocation Project—the SR 31 corridor—also serves as an important truck route for commercial vehicles transporting goods to and from Lee, Charlotte, and DeSoto Counties. (Doc. 14-1 ¶ 8). And the SR 31 corridor is part of the evacuation-route network established by the Florida Division of Emergency Management. Designated as a primary evacuation route, this corridor is essential for evacuating residents throughout the northern portion of Lee County and the central and eastern portions of Charlotte County. (Doc. 14-1 ¶ 9). Which is why the planned expansion anticipates elevating the road to promote a more resilient roadway during flooding events. (Doc. 14-1 ¶ 10). In sum, the expansion of SR 31 is vital to improving emergency evacuation and response times (Doc. 14-1 ¶ 9), and it supports

the corridor's role as an evacuation route to SR-78 and ultimately I-75. (Doc. 14-1 ¶¶ 12-17).

In addition to the existing conditions, consideration of future development plans is necessary in light of the Babcock Ranch planned development. The Babcock Ranch Community is the primary development necessitating the expansion of SR 31's roadway capacity. (Doc. 13-1 ¶ 3). The SR 31 project's plans have been carefully coordinated between Babcock Ranch Holdings, LLC (the "Developer"), the Babcock Ranch Community Independent Special District (the "District"), and FDOT. (Doc. 14-1 ¶ 17). Pursuant to the Master Development of Regional Impact Master DRI Development Order (the "Babcock DRI"), the Developer received approval to construct the Babcock Ranch Community, including entitlements for 17,870 residential units, 1.4 million square feet of retail space, 3.5 million square feet of office space, 600 hotel rooms, 650,000 square feet of industrial space, 177 hospital beds, 418 units of assisted living facilities, 54 golf holes, and supporting facilities as detailed in the supporting record. (Doc. 13-1 ¶ 3; Doc. 13-2, Babcock DRI).

Furthermore, the Babcock DRI provides that the Developer is responsible for construction of transportation improvements. (Doc. 13-1 ¶ 4). The Developer's obligation to construct specific transportation improvements is also governed by a series of agreements with FDOT and the District. (Doc. 13-2). Under these

4

agreements, the Developer and the District must complete the transportation improvements by 2028 and are required to proceed continuously and diligently in the interim. (Doc. 13-1 ¶ 5). In connection with the Developer's anticipated roadway construction, the Developer and District have issued $286,720,000 in District development bonds and $138,715,000 in Industrial Development Authority bonds related to the construction of the water, wastewater, and irrigation-quality water utilities for the Babcock Ranch Community. If the Developer and District are unable to proceed with the transportation improvements on the designated schedule, the Developer and District would be in jeopardy of non-repayment of the bonds. (Doc. 13-1 ¶ 6).

In order for the Developer and District to proceed with the required transportation improvements, FGT must relocate a portion of the Fort Myers Lateral Pipeline to avoid conflicts. (Doc. 13-1 ¶ 7; Doc. 14-1 ¶ 18). According to the Developer, if the Developer and District are unable to proceed with the transportation improvements, the Babcock Ranch Community development would not be able to move forward, resulting in a tremendous loss to the Developer, District, bond holders, and the public at large due to the expanded need for housing and related community amenities. (Doc. 13-1 ¶ 8).

### B.  Authorization for the Relocation Project and Subject Easements

On September 27, 1982, FERC entered an order issuing a Blanket Certificate of Public Convenience and Necessity ("Blanket Certificate") that authorizes FGT to construct, operate, and abandon interstate natural gas pipelines and facilities upon compliance with certain notice conditions. (Doc. 11-2, FERC Blanket Certificate).

On May 17, 2023, FGT filed with FERC a prior-notice request (the "Prior Notice Request") pursuant to Section 157.205, Code of Federal Regulations, which governs blanket certificates, as required by Sections 157.203(c) and 157.208(b), Code of Federal Regulations. (Doc. 10-1 ¶ 4). FERC was required to consider the environmental impacts of the Relocation Project as set forth by the National Environmental Policy Act ("NEPA"). (Doc. 11-1 ¶ 8). FERC issued its findings in an Environmental Assessment ("EA") dated July 21, 2023. (Doc. 10-1 ¶ 5; Doc. 11-1 ¶ 9).  In the EA, FERC concluded that the Relocation Project would not constitute a major federal action significantly affecting the quality of the human environment. (Doc. 11-1 ¶ 9).

On July 25, 2023, FERC, in Docket No. CP23-482-000, authorized the Relocation Project and FGT's construction, operation, and maintenance of the project's facilities under FGT's Blanket Certificate (Doc. 12-1 ¶ 2). The pipeline facilities will consist of approximately 1.53 miles of 26-inch replacement natural gas lateral pipeline and appurtenant facilities, and the abandonment of approximately

6

1.45 miles of the existing 26-inch Fort Myers Lateral pipeline and related facilities. (Doc. 11-1 ¶ 11). FGT will relocate and construct the replacement 26-inch natural gas lateral pipeline and appurtenant facilities in new easements and inside the existing FGT easement in some locations. (Doc. 11-1 ¶ 12). In addition, FGT will also install one new 6-inch takeoff lateral line valve in Charlotte County—on FGT's existing 26-inch Fort Myers Lateral—for a temporary alternate delivery connection, and install pipe and other materials for gas transportation deliveries to the PGS gas pipeline system to back-feed the TECO/PGS Fort Myers delivery point in Lee County, Florida. (Doc. 11-1 ¶¶ 13, 15). FGT will also conduct a class upgrade hydrostatic test on the existing Fort Myers Lateral to comply with federal safety regulations regarding new and future development in areas near FGT's pipeline. (Doc. 11-1 ¶ 14).

To construct and operate the project in accordance with the Blanket Certificate, FGT must acquire the subject easements on SWFHR's parcel of land. (Doc. 10-1 ¶ 8; Doc. 1-1, Description of Owner's Parcel). As part of the application process to approve the Relocation Project, FERC reviewed and authorized the location of the subject easements on SWFHR's land. (Doc. 10-1 ¶ 9). This entailed FGT submitting and FERC approving the alignment sheets showing the final alignment of the route for the Relocation Project. (Doc. 10-1 ¶ 9; Doc. 10-2, FERC-

approved alignment sheets). FGT prepared the subject easements to conform with the FERC-approved alignment sheets. (Doc. 10-1 ¶ 10; Doc. 1-2, subject easements).

In November 2021, FGT began communicating with SWFHR, and has continued to do so, through its representative to purchase the subject easements. (Doc. 10-1 ¶ 11). In addition, FGT retained a Florida licensed real estate appraiser to prepare a written appraisal report estimating the value of the subject easements. (Doc. 10-1 ¶ 12). FGT sent SWFHR offer letters for the subject easements, attaching the appraisal and specifying the terms of the subject easements. (Doc. 10-1 ¶ 13; Doc. 10-3, Copy of Offer Letter and Appraisal). The offers were not accepted. (Doc. 10-1 ¶ 13).

### C. Construction Timeline for the Relocation Project

A pipeline project such as the Relocation Project requires a complex and coordinated construction process, with work activities being performed in sequential phases. (Doc. 11-1 ¶ 18). The construction schedule is predicated upon construction of the new pipeline facilities starting in particular places within the several locations and proceeding in a sequential manner and in linear segments. (Doc. 11-1 ¶ 20). The process is comparable to an assembly line, with specialized teams following each other down the right of way, successively performing tasks. (*Id.*). To mitigate against construction risks that threaten FGT's ability to relocate the Fort Myers Lateral pipeline prior to FDOT's planned roadway-improvement projects, FGT needs to

begin pre-construction activities as soon as possible and no later than January 8, 2024. (Doc. 11-1 ¶ 17).

To timely commence and complete the Relocation Project, FGT must provide its contractors immediate access to all properties within the spread. (Doc. 11-1 ¶ 23). Construction has been planned so that there will not be conflicting activities at any location along the FERC-authorized route. (*Id.*). Thus, FGT's inability to enter even a single parcel as soon as possible could have a domino effect and delay completion of the entire Relocation Project. (*Id.*). In addition to these pre-installation activities, FGT's contractors need access to the authorized construction areas to mobilize equipment and resources to begin the installation activities by January 8, 2024. (Doc. 11-1 ¶ 24).

If FGT's contractors are unable to begin construction in early January 2024, the unrecoverable delay costs that FGT will incur and owe on a daily basis would be significant. (Doc. 11-1 ¶ 25). For example, if construction of the pipeline facilities is delayed just one week beyond January 8, 2024, FGT would incur $45,000 to $219,300 in delay costs per week. (*Id.*). And once construction commences, FGT will be liable to its contractor for any delays that occur if a contractor is unable to access a property in sequential order. In that event, FGT will incur delay costs that are estimated to range between $48,522 to $93,428.72 per day. (Doc. 11-1 ¶ 26). Moreover, if a contractor's crew is not able to enter any property and the sequenced

9

work schedule is disrupted at a "no access" property, then the crews and equipment must "skip" that property and return at a later date. (Doc. 11-1 ¶ 27). Each time that might occur, FGT must pay the contractor "move-around costs" for each crew, estimated between $22,500 to $49,100.44. (*Id.*).

Neither delaying the start of the Relocation Project nor temporarily stopping construction at an unresolved parcel are tenable options, as they would delay completion of the Relocation Project indefinitely and involve significant costs. (Doc. 11-1 ¶¶ 25-27). If FGT is unable to meet the targeted date for relocation of existing facilities to allow for the expansion of SR 31 and related property development while maintaining its service to the surrounding area, FGT will suffer damage to its reputation and business goodwill that cannot be reasonably calculated. (Doc. 11-1 ¶ 28). Also important, FGT and Florida Power and Light Company ("FP&L") will have an outage date tentatively set for some time March 18 to April 4, 2024, to allow FGT to complete the relocation project tie-ins and hydrostatic testing. (Doc. 11-1 ¶ 29). Missing the scheduled outage period will result in hardship and potential impacts to the electrical grid. (*Id.*).

## III.    Partial Summary Judgment—Federal Power To Condemn

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Natural Gas Act authorizes a party to exercise the federal power of eminent domain to acquire property necessary for an interstate natural gas pipeline project when: (1) the plaintiff is the holder of a FERC certificate authorizing a project, (2) FERC has determined that the property is necessary for the project, and (3) the plaintiff is unable to acquire the property by contract. *Transcon. Gas Pipe Line Co. v. 6.04 Acres, et al.*, 910 F.3d 1130, 1152 (11th Cir. 2018) (citing 15 U.S.C. § 717f(h)). Specifically,

> When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipeline or pipelines for the transportation of natural gas . . . it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts.

15 U.S.C. § 717f(h).

FGT has satisfied these elements and, as a matter of law, possesses authority to condemn the subject easements. The Blanket Certificate issued to FGT grants FGT the unequivocal power of eminent domain, which includes the power to condemn any land—including the subject easements—necessary for completion of the Relocation Project. *Transcon. Gas*, 910 F.2d at 1152; *see also Fla. Gas Transmission Co. v. 9.65 Acres of Land,* 2019 WL 2613337 (M.D. Fla. Mar. 12, 2019), *report and recommendation adopted*, 2019 WL 2613305 (Mar. 25, 2019).

Furthermore, FERC has determined that the subject easements are necessary for the Relocation Project. Specifically, the subject easements conform to the pipeline-route-alignment sheets reviewed and approved by FERC. (Doc. 11-1 ¶ 22; Doc. 10-1 ¶ 9; Doc. 10-2); *cf. Sabal Trail Transmission, LLC v. Estate*, No. 1:16CV100, 2016 WL 8919397, *5 (N.D. Fla. May 23, 2016) (approving subject easements that conformed with the FERC approved alignment sheets). Finally, FGT has been unable to acquire the subject easements by contract. An unaccepted offer is sufficient to satisfy the requirements of the Natural Gas Act, and "good faith" negotiations are not required. *See Transcon. Gas,* 910 F.3d, at n. 16; s*ee also Sabal Trail*, 2016 WL 8919397 at *6 ("Although some Defendants have argued that Sabal Trail must establish pre-suit 'good faith negotiations,' this Court finds 'good faith negotiations' are not required under the NGA."). Here, FGT communicated with SWFHR about the subject easements and provided a written appraisal report estimating the value along with offer letters. Nevertheless, FGT has been unable to come to an agreement on compensation with SWFHR, and its offers were rejected. FGT's efforts satisfy § 717f(h).

Accordingly, FGT is authorized by the Natural Gas Act to exercise the power of eminent domain and has the right to condemn the subject easements identified in Exhibit 1 hereto and incorporated by reference. *See Columbia Gas Transmission Corp. v. An Easement to Construct, Operate & Maintain a 24-Inch Pipeline*, No.

5:07CV04009, 2008 WL 2439889, *2 (W.D. Va. June 9, 2008) (The role of the court in evaluating an eminent domain case under the Natural Gas Act extends solely to "examining the scope of the certificate and ordering the condemnation of property as authorized in that certificate.").

## IV. Preliminary Injunction—Immediate Possession

Under the Natural Gas Act, federal district courts have the equitable power to grant a condemnor immediate possession of a property interest through issuance of a preliminary injunction. *Transcon. Gas*, 910 F.3d at 1151-52. Such preliminary injunction is "permissible so long as the pipeline company's right to condemn the property has been finally determined, such as through the grant of a motion for summary judgment, and all other requirements for issuance of a preliminary injunction have been met." *Id.* at 1152. And with FGT's right to condemn finally determined, it need only show: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 (11th Cir. 2015) (citations omitted).

Success on the merits is a virtual certainty because the court has determined FGT has the right to condemn the subject easements. And granting FGT immediate

possession would advance, not undermine, the public interest. "Congress passed the Natural Gas Act and gave gas companies condemnation power to ensure that consumers would have access to an adequate supply of natural gas at reasonable prices." *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 830 (4th Cir. 2004). Congress did so because "supplying natural gas for the generation of electricity and other energy needs advances the public interest." *Sabal Trail Transmission, LLC v. +/- 0.4 Acres of Land in Marion Cnty. Fla.*, No. 5:16-cv-210-Oc-30PRL, 2016 WL 2997672, *5 (M.D. Fla. May 25, 2016).

Here, the Relocation Project will allow safe relocation of the Fort Myers Lateral pipeline in order to allow FGT to continue to provide natural gas in compliance with federal safety regulations, while also allowing necessary roadway expansion and improvement to accommodate existing and proposed development. These factors strongly weigh in favor of granting the requested injunction. *See, e.g.*, *Sage*, 361 F.3d at 829 ("ETNG's inability to satisfy [its] commitments would have negative impacts on its customers and the consumers they serve."); *Columbia Gas Transmission, LLC v. 1.01 Acres*, 768 F.3d 300, 316 (3d Cir. 2014) (finding safety risks associated with delay in replacement and relocation of pipeline strongly supported public interest element of granting preliminary injunction).

The court further finds that FGT will suffer irreparable injury if the requested preliminary injunction is not granted. Such irreparable injury includes significant

additional construction costs and unrecoverable financial losses due to work suspensions, move-arounds, or specialty-crew-remobilization charges. Each disruption of the Relocation Project's orderly, linear, workflow would force FGT to incur such added construction costs that could not be recouped and constitute irreparable injury. *Cf. Sabal Trail*, WL 8919397 at *8 ("A delay in construction of the pipeline may jeopardize Sabal Trail's ability to meet its FERC authorized in-service date and cause Sabal Trail to suffer significant financial losses."). Moreover, a delay will cause FGT to suffer damage to its reputation and business goodwill that cannot be reasonably calculated. *See Transcon. Gas*, 910 F.3d at 1170 (affirming grant of preliminary injunction and finding any delay that caused Transcontinental to miss its in-service deadline would also expose it to a significant risk of damage to its reputation, competitive standing, and business goodwill).

Furthermore, the irreparable injury at stake for FGT far outweighs any damage the proposed injunction may cause defendants, which damage is entirely reparable by the payment of compensation. The right to compensation under the Natural Gas Act is not harmed by immediate possession of the subject easements, and "[t]he damages that a preliminary injunction would cause Defendants [] comes down only to any damages that might result from a defendant losing possession of the property in question sooner, rather than later, after compensation for the taking has been finally determined." *Transcon. Gas*, 910 F.3d at 1166. The defendants are

guaranteed the right to just compensation for the condemned property interests, and any damages suffered based on the timing of the taking "are capable of determination at the compensation stage of the litigation." *Id.*

In order to satisfy the requirement under Rule 65(c) of the Federal Rules of Civil Procedure that a movant give security upon issuance of a preliminary injunction, FGT is prepared to post a bond equal to two times the amount of the combined appraised value of the subject easements, that being $91,800. The court finds such security, in addition to other existing remedies, to be sufficient. *See Transcon. Gas*. 910 F.3d at 1174.

## V. Conclusion

FGT's motion for partial summary judgment is **GRANTED**, and FGT has the right to condemn the subject easements. FGT's Motion for Preliminary Injunction and Immediate Possession is **GRANTED**, and FGT shall have the right to possess and use the subject easements (described in Exhibit 1 attached hereto and incorporated herein) for the construction and operation of the Relocation Project, conditioned upon FGT posting a bond in the amount of two times FGT's appraised value of subject easements, $91,800. This court shall retain jurisdiction to determine full compensation for the subject easements; upon payment of compensation, render a final judgment condemning the subject easements; and render such additional orders as may be just and proper.

**ORDERED** on December 18, 2023.

_____
NICHOLAS P. MIZELL
United States Magistrate Judge

17